

# NUMBER 13-21-00280-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

DEVON KEITH DEBORD,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

## On appeal from the 24th District Court
## of Goliad County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Tijerina**
**Memorandum Opinion by Justice Benavides**

It is undisputed that Christopher Debord shot and killed Margaret Tucker while attempting to burglarize her home. It is also undisputed that just prior to the incident, Christopher and his cousin, appellant Devon Keith Debord, drove together to another residence where Christopher stole a vehicle and a rifle. Now driving in two separate

vehicles, Devon admittedly followed Christopher to the Tucker residence but claims he stayed outside the gate to the property, unaware of Christopher's intentions.

Both men were charged with capital murder. Christopher agreed to plead guilty to felony murder in exchange for a life sentence with the possibility of parole. Approximately nine months later, Devon pleaded not guilty and went to trial. The jury convicted Devon of the lesser included offense of felony murder based on an "intent to promote or assist" theory of party liability. *See* TEX. PENAL CODE ANN. §§ 7.02(a)(2), 19.02(b)(3). He was sentenced to fifty years' imprisonment.

Devon raises what we construe as five issues on appeal. In his first issue, Devon argues that the evidence was insufficient to support his conviction because, among other things, the State failed to prove that he intended Tucker's death. By his second issue, Devon complains that he was denied a fair trial because the trial court abandoned its neutral and detached role by: (1) engaging in an ex parte communication with the State, (2) compelling Christopher to testify after he invoked his Fifth Amendment right against self-incrimination, (3) aiding the State in the admission of evidence, (4) exhibiting hostility towards Devon's counsel, and (5) communicating with Tucker's family during the trial. In his third and fourth issues, Devon argues that the trial court erred by admitting an unauthenticated Facebook image into evidence and allowing the State to present an undisclosed witness. By his final issue, Devon asserts that the trial court erred by failing to conduct a hearing on his motion for new trial because the motion raised issues that occurred outside the trial record. We affirm.

## I. BACKGROUND

Devon's trial commenced on May 24, 2021. The following is a summation of the evidence presented and the proceedings during and after trial.

**A.     Thomas Cooley**

Thomas Cooley lives on Coletoville Road in a rural part of Victoria County, Texas. On the morning of Sunday, September 22, 2019, Cooley awoke to the sound of his dogs barking. Peering out of a window, Cooley saw an individual he did not recognize standing by his carport. The individual had "[s]andy blond, reddish hair." Cooley went to his bedroom to retrieve a handgun, and when he returned to the window, he saw someone driving away from his home in "[a] maroon-ish orange car." Cooley went outside and realized that his blue Jeep was missing. He called the Victoria County Sheriff's Office and reported the Jeep stolen.

Later that day, the Goliad County Sheriff's Office informed Cooley that his Jeep had been recovered. The Jeep had damage to the front pipe bumper on the driver's side of the vehicle. According to Cooley, there were new "scrapes . . . on the pipe that looked heavier than just running over regular mesquite or huisache or anything like that." The police also recovered a .22 caliber rifle in the vehicle. Cooley identified the rifle as belonging to him but said that he keeps it in a shop on his property, along with a magazine and a box of shells.

Later that week, police found pieces of a broken glass pipe in Cooley's driveway. Cooley testified that the pieces were found near the area where he had seen the "red" car the morning of the incident. Cooley confirmed that he did not give anyone permission to

3

take his Jeep or rifle.

Cooley is familiar with the Tucker property and testified that it takes approximately four minutes to drive from his residence to the Tucker residence, which is located over the county line in Goliad County. The property is surrounded by a fence, and a person must pass through a gate to enter the property. There are other structures on the property besides the Tucker residence, and although the residence is visible from the road, Cooley confirmed that "[i]t's a pretty good distance from the road."

## B.    Lee Grisminger

Lee Grisminger testified that on the morning of September 22, 2019, at approximately 9:40 a.m., he was driving on Coletoville Road when a Jeep, traveling in the opposite direction, entered his lane and ran him off the road. Grisminger looked in his driver's side mirror and observed a "light-colored vehicle following very closely" behind the Jeep. Grisminger said that both vehicles were speeding and "that the vehicle following the Jeep was following at an unsafe distance." Grisminger also remembered that the trailing vehicle had body damage but could not recall anything more specific.

## C.    Sheriff's Deputy Henry Guerra

Henry Guerra was working patrol as a Goliad County sheriff's deputy on September 22, 2019. At approximately 11:00 a.m., he responded to a call "about a strange subject wearing a black hoodie and blue jeans who was seen crawling out or coming out from underneath one of the bridges in the area [of] Perdido Point Estates and Old Highway 59." Deputy Guerra made contact with an adult male matching that description, and the individual identified himself as Devon Debord. Devon told Deputy

4

Guerra "that some friends had dropped him off, and he was waiting to catch a ride to Victoria [from] somebody else."

While Deputy Guerra was speaking to Devon, Christopher pulled up in a blue Jeep, and Devon told the deputy that Christopher was there to pick him up. Deputy Guerra took down the license plate of the Jeep and relayed it to a dispatcher, who advised Deputy Guerra that the vehicle had been reported stolen. The dispatcher also informed Deputy Guerra that Devon had an outstanding warrant for his arrest.

Deputy Guerra placed both men under arrest. Another deputy arrived on the scene, and the two men were secured in separate police vehicles. Deputy Guerra searched the Jeep and recovered a .22 caliber rifle with "a loaded live round inside the chamber." Cooley later arrived on the scene, and Deputy Guerra released both items to Cooley.

Based on Cooley's prior report about a "maroon car," officers searched the area and located a vehicle "hidden in between some railroad tracks and some tall grass and brushy area" off Old Highway 59. Deputy Guerra described the vehicle as "a maroon Pontiac." The doors to the vehicle were locked, but Deputy Guerra could see Devon's "Texas Department of Criminal Justice Institutional Division offender identification card hanging from the review mirror." The vehicle was registered to Christopher's mother-in-law.

When Devon was processed at the county jail, he was wearing blue jeans, a black hooded sweatshirt with a zipper, and a brown belt. A picture of the belt was admitted into evidence and shows a distinctive white stitch pattern along the top and bottom of the belt

5

and "DEBORD" engraved on the back in large capital letters.

Later that same day, Deputy Guerra responded to a call concerning an unresponsive female at the Tucker residence. He "had difficulty opening [the gate] because it appeared to have been struck or broken somehow." On top of the gate was a fabricated metal sign that said, "Twisted Ranch." Pictures admitted into evidence show that the property includes cattle, pens, a barn, and a workshop.

The police found Tucker deceased in her bed under the covers. Initially unsure of what caused Tucker's death, Deputy Guerra observed bruising around her eyes, blood coming from her nose, and what appeared to be a laceration on her cheek. The local justice of the peace ordered an autopsy to determine Tucker's cause of death. The forensic pathologist who conducted the autopsy determined that the laceration was an entry wound from a bullet. The bullet was recovered from Tucker's brain, and the pathologist concluded that Tucker's cause of death was a gunshot wound to the head and that the manner of death was homicide. According to Deputy Guerra, there were no signs of a struggle, and based on Tucker's position in the bed, Deputy Guerra opined "that she was asleep when this incident happened."

Upon receiving the results of the autopsy report, Deputy Guerra returned to the Tucker residence to conduct a search. The police recovered a .22 caliber shell casing in Tucker's bedroom, between the bed and the dresser. The casing had the letter "C" stamped on it, which, according to Deputy Guerra, indicated that it was manufactured by "CCI." Deputy Guerra further testified that the rifle he recovered from the blue Jeep driven by Christopher was loaded with .22 caliber CCI bullets.

6

**D.      Sheriff's Deputy Donna Starry**

Donna Starry was a deputy for the Goliad County Sheriff's Office at the time of the incident and helped process the crime scene. She examined the gate to the property and "found some red paint scrapings and some marks that were not . . . previously on the gate." These scrapings and marks were "in between the top and the bottom" of the gate, "[o]n the side that opens."

Deputy Starry executed a search warrant on the Pontiac. Photographs of the vehicle taken during the search were admitted into evidence. One photograph showed scrapes on the front bumper, and Deputy Starry testified that the paint found on the gate matched the paint from the vehicle. Another photograph showed a dent in the trunk, and Deputy Starry agreed that the damage to the trunk was consistent with Grisminger's description of the vehicle he observed following the Jeep.

Deputy Starry testified that Christopher's wife sent her a screen shot of a photograph allegedly posted on Devon's Facebook account on the morning of the incident. Devon objected to the admission of the image on several grounds, and after a lengthy discussion outside the presence of the jury, the trial court admitted the following image into evidence:



Deputy Starry insinuated that Christopher's wife identified the person in the photo as Devon. Deputy Starry agreed that the person in the photograph is wearing the same hooded sweatshirt and belt that Devon was wearing when he was arrested. She also testified that the person appears to be wearing a ski mask and agreed that it would be unusual to see someone wearing a ski mask in September when typically, "[i]t's still hot" outside.

During cross examination, Deputy Starry conceded that during her investigation she had not found any evidence that would place Devon inside the Tucker residence. She also conceded that she had no personal knowledge as to when the above photograph

---

[1] We have made non-substantive alterations to the image by cropping it and adding a border.

was taken or who posted it to Facebook.

**E.      Christopher**

The State called Christopher to testify. Pursuant to his guilty plea, Christopher was serving his sentence in state prison. The terms of his plea agreement did not expressly require him to testify at Devon's trial, but he did agree to "[b]e de-briefed by law enforcement, and to be completely honest & forthcoming to all questions asked." As part of that process, Christopher signed a typed statement confessing to shooting Tucker but also implicating Devon in the burglaries at the Cooley and Tucker residences.

After answering some introductory questions, Christopher said, "I'm going to go ahead and plead the Fifth for the remainder of the questions." Then the following exchange occurred:

[PROSECUTOR]:    Yeah. You can't do that anymore.

[CHRISTOPHER]:   Why?

THE COURT:       I'll advise you. I'm the Judge. The Fifth Amendment says that I refuse to testify on the grounds it might incriminate me. Your case is over. It can't possibly incriminate you. You are required to answer the questions. If you do not answer both of the attorneys, I will find you in contempt, and I can impose a sentence that stacks on the sentence that you're presently serving. You are required, by law, to answer the questions, so answer the questions.

[CHRISTOPHER]:   You can go ahead and put me in contempt.

After the jury left the courtroom, Christopher elaborated on his decision not to testify, saying he now regretted cooperating with police because he is not "a snitch." When the State asked Christopher if he was afraid of Devon, Christopher reiterated his reason

9

for not testifying: "I'm just not a snitch."

The trial court found Christopher in contempt of court and sentenced him to "six months in the county jail to be stacked on the sentence that he now has." The trial court informed Christopher that he would be called to testify every day for as long as necessary, and that for each day he refused to testify, the trial court would find him in contempt and impose an additional six-month sentence. The trial court then reconvened the jury and admonished it not to hold Christopher's refusal to testify against either party. However, the judge also conveyed his dissatisfaction with Christopher's decision, telling the jury that if Christopher continued to refuse to testify, the trial court would continue to stack six-month sentences "until such time as he either testifies or he gets enough life sentences that he can't get out."

When trial resumed the following day, the trial court made the following announcement:

> I just wanted the attorneys to know I spent some time last night looking at what would be appropriate and what would be inappropriate for me to do with a witness who is refusing to testify, *and I couldn't really get a decision on that until I spoke to the State this morning*. The question I had in my mind is, was Christopher, when he pled, was it a condition of his plea that he testify truthfully, not that he testify this way or that way, but just truthfully.
>
> *The State has assured me that that was part of his plea*, his plea bargain agreement, so when I bring him in today, I am going to explain to him, just as I did the other day, I could find—I will find him in contempt if he doesn't plea [sic], but I understand that that has little weight with him because he's serving a large sentence, although he is eligible—he will be eligible at some point for parole. I need to advise him, and I got some counsel from some attorneys that help me on appellate matters to make sure I don't get tangled up in a web that would result in having to try the case, again.

. . . .

So, anyway, *I have been advised that what I need to advise him on* so that he is privy to what the Court believes are the ramifications of his refusal to testify is that in addition to the contempt, *it is possible, if not probable, that if the State chose to do it, they could withdraw his plea and try him for the offense that he was charged with*, which I believe, if I am correct, it was capital murder?

(Emphasis added).

The State then confirmed its belief that it had the authority to withdraw Christopher's plea agreement if he refused to testify and expressed its intent to seek "the death penalty" if his case was retried. The trial court responded that it would advise Christopher accordingly.

At this point, Devon's counsel objected that he was not present when the trial court discussed this issue with the State:

| [COUNSEL]: | I want to make it clear for the record, the representation of the Court is that the Court and the State had a discussion, and that discussion involved what the past plea was, what the past agreement was. |
|---|---|
| THE COURT: | Only to the extent of what I could or could not do with this person or should or should not do, yes, sir. |
| [COUNSEL]: | I want to make clear for the record that I was not notified of a meeting between the State and the Court. I was not a part of any conversation between the State and the Court. I think it's inappropriate for the State to— |
| THE COURT: | Okay. And I understand what you're doing. |
| [COUNSEL]: | I want to get it on the record. |
| THE COURT: | Well, go ahead and put it on the record, Mr. Wilson. You can do that. |

11

[COUNSEL]:        I understand, Judge.

THE COURT:        Please do it.

[COUNSEL]:        I believe it's highly inappropriate—

THE COURT:        Highly, not just inappropriate? Well, I just need to know what you mean by highly.

[COUNSEL]:        Judge, if I can finish. I think it's highly inappropriate for the Court and the State to talk about anything regarding this case, whether it involves this particular witness or any other witness without me being notified, without me being a part of that discussion. I want the record to be clear that I was not a part of it, and I found out about it when the Court instructed everyone here in open court about it.

I'm done.

THE COURT:        Oh, you're done, okay.

Well, let me explain the reason that I asked him because if he would have said, we don't have any intention of doing anything, I would have sent him back to TDC right now, so I was wanting to take that step so that I wouldn't have to wait. Then when everybody got here, you got here exactly a quarter to 9:00, that I could just tell them, take him back, wouldn't have to talk to him, wouldn't have to do anything, so my idea was to expedite this matter.

[COUNSEL]:        I understand.

THE COURT:        If he states that, well, we're thinking about or we're going to, then I need to bring him over and advise him. That's the reason I asked the State. You would have no say in whether the State goes forward or does not go forward.

[COUNSEL]:        I understand that.

12

THE COURT: Well, let me finish. I let you finish.

So I didn't feel there was any need because I am not asking or telling the State to do something. I am trying to decide what actions I am going to take, and it's based on what the State tells me that they intend to do. And if they would have said, no, we don't intend to prosecute him, I would have told them, put him in the car and take him back to prison. That's why I inquired.

[COUNSEL]: I understand, Judge. I understand having known you and tried cases with you that you are a stickler for the rules. In this particular situation, I think the rules are clear in terms of having conversations involving counsel and the Court, and I don't mean anything disparaging, but I want the record to be clear because I don't know what his deal was with the State.

THE COURT: Nor do I.

[COUNSEL]: I don't know what the deal was. I don't know every component of it, and I think that the district attorney should have refrained from that discussion until I was notified, and even though I have nothing to do with what they do, I think it's highly inappropriate at this point for that conversation to have taken place. I could have had input. I could have given my perspective. I did not have that opportunity, and I just want the record to reflect that.

Christopher was then called to the stand, and the trial court gave him the following admonishment:

[Christopher], in order for you to be able to understand whether you want to testify or not testify, I need to advise you of your rights, and I neglected to put one thing in there which could be—I'm not saying it is something that's going to happen, okay, but it is—I will say it's a possibility.

In addition to the contempt that I know you understand that, but if the State had an agreement with you that you would testify, and if you don't testify—I don't know whether the State can or can't, but it is possible that they could seek to set aside your conviction and then come back and try

13

you. I don't know that they can or can't, but it's, it's something I have to advise you of. Do you understand what I'm saying?

The jury was then called into the courtroom, and the State began its direct examination. Christopher acknowledged that he accepted a plea bargain agreement that required him to cooperate with the State but said he was unsure if the agreement required him to testify in Devon's trial. After acknowledging that he signed the above-mentioned statement, he said he was uncertain of its contents and that "there was a lot of in-discrepancies [sic] due to the attorneys." The State admitted a copy of the statement into evidence without objection. After Christopher refused to read the statement for the jury, the trial court allowed the State to read it into the record.

In the statement, Christopher alleges that he and Devon were "using drugs" on the day in question and that he "had been up a couple of days when [Devon] came to [his] house." Their "plan that day was to try to get some money . . . [by] trying to get things to sell." Before they left Christopher's house, Devon started "taking pictures with a mask and posting them."

According to Christopher's statement, it was Devon's idea to go to Cooley's house, and Devon directed Christopher how to get there. After they arrived, Devon spotted Cooley, and they fled with Christopher driving Cooley's Jeep and Devon driving the "red car." Christopher said he only took the Jeep "because Devon wanted it." Afterwards, they "drove around and looked for other houses that looked like they had money," and together they "picked" the Tucker property "because the gate was nice."

Christopher further alleges in the statement that he "pushed the gate open with the

14

[J]eep," and they both "got out of the cars . . . [and] were looking for stuff that was easy to sell." Christopher acknowledged that he went inside the Tucker residence alone, and he claimed that the shooting was accidental. He explained that he "was really high," "felt confused and paranoid," and "it was hard for [him] to tell what was real." He said he got "scared" when a dog began barking at him, and he shot in the direction of the dog but unintentionally hit Tucker.

Christopher also claimed in his statement that while he was inside, "Devon waited outside and kept a look out." When Christopher fled the residence, "Devon pushed the gate open for [Christopher] with the car so that [Christopher] could get out." They left in their separate vehicles and met at a church parking lot nearby. Christopher told Devon what happened, and they decided to go in separate directions. After they separated, Devon called Christopher and asked for a ride. When Christopher arrived, he saw the police car and decided to pull over after Devon flagged him down. Finally, Christopher reiterated that "[w]hat we did was both of our ideas."

After the statement was read into the record, Christopher confirmed that he gave the statement but said "it doesn't sound true" and refused to answer any further questions. The trial court excused Christopher as a witness but told him that he would be held in the Goliad County jail until the completion of trial. The trial court also informed Devon's counsel that he was free to speak with Christopher.

After a recess, Devon's counsel informed the trial court that he had spoken to Christopher and that Christopher was now willing to testify and fully answer questions from both sides. The State recalled Christopher, and the trial court admonished him that

15

if he elected not to answer all questions asked by both sides, then his entire testimony would be stricken. The trial court also admonished him that he was expected to testify truthfully and that any material misrepresentations made under oath would constitute aggravated perjury. Christopher said that he understood and that he was prepared to "answer the questions." After the jury was called back in, the State passed the witness without further questioning, and Devon's counsel began cross examining the witness.

Christopher agreed that he had never seen or spoken with Devon's counsel prior to appearing in court the day before. He also agreed that his prior statement was "not true." According to Christopher, he only signed the statement because: (1) he was charged with capital murder, and he "would have signed any statement" to avoid a potential death penalty or life without parole; and (2) based on what he observed at the jail after he and Devon were arrested, he "had a feeling [Devon] snitched" and decided "to look out for [him]self." Christopher reiterated that he "would have signed any statement" at that point, and "[i]t didn't matter what they put on it." According to Christopher, his attorney typed the statement, and he had not seen it before signing and reading it into the record during his guilty plea.

Christopher also elaborated on his decision to invoke the Fifth Amendment when he was called to testify the day before. He claimed that the prosecutor met with him two weeks prior to Devon's trial and threatened to charge him with perjury and have ten years added to his sentence if his testimony did not match his prior statement. Christopher believed that he could not testify truthfully because, from the State's point of view, he would be committing perjury, and so the best course of action to protect himself was to

16

plead the Fifth Amendment. He agreed that he felt "boxed in" because not testifying meant the trial court would continue to find him in contempt and add additional time to his sentence.

Devon's counsel then walked Christopher through the statement. Christopher testified that on the day in question, he had been awake for eight straight days doing methamphetamine. Devon had been staying with him for a few days, and they were both doing methamphetamine that morning. Christopher decided to smoke the drug for the first time to intensify its effects. This made him "extremely" high. He was so high that at one point, he thought he was calling someone on the phone, but instead he was just talking to his hand. He acknowledged that Devon took pictures wearing a mask but said Devon was "just goofing off."

Christopher acknowledged that he had a plan to make money that day but said it involved asking a drug dealer to provide him drugs on credit that he could then sell. According to Christopher, Devon did not need money because he had sold some mineral rights and would be receiving a check for $50,000 the following day. At some point that morning, while the two of them were out driving around looking for the drug dealer, they realized that the dealer was actually in the Houston area. They were low on gas, and Christopher acknowledged that Devon directed him to Cooley's home but said it was only to ask for gas. Devon stayed in the car and suggested that Christopher ask for the gas. Instead, Christopher went into Cooley's shop and spotted a gun, which he took with the intention of selling it for money. When he came out of the shop, he pointed the gun at some barking dogs, and Devon jumped out of the car and knocked the gun down. It was

17

at this point that Christopher saw keys in the Jeep. According to Christopher's testimony, he alone made "a spur-of-the-moment decision" to steal the Jeep.

They left Cooley's residence in separate vehicles, and although Christopher acknowledged that Devon was following him in the car, he claimed that it was his decision to turn into the Tucker residence and force his way through the gate. He denied that the two of them were communicating by phone beforehand. He said that he entered the Tucker property without a plan and was unaware of whether Devon was even following him at that point. He also said the two of them had no communication while he was on the Tucker property. Christopher acknowledged that he entered the Tucker residence and spotted a gun safe inside. His intention was to steal any guns he could find.

Christopher categorically denied that he and Devon ever had a "plan" to burglarize or steal that day or that Devon encouraged, aided, or abetted him in any way at the Cooley or Tucker residences. He acknowledged that when he fled the Tucker residence, Devon pushed the gate open, which allowed him to leave the property. But he denied that Devon was serving as a "lookout." Rather, he claimed that Devon had no knowledge of what he was doing on the property and was "probably . . . trying to figure [it] out."

Afterwards, they met at the church parking lot, and it was at this point that Christopher told Devon what had happened. After they separated, Devon called or texted Christopher and asked him for a ride because Devon's car had run out of gas.

As far as his prior written statement was concerned, Christopher further testified that "[t]here's a whole lot of we's in there that are false." He acknowledged that he was interviewed by police after his arrest and implicated Devon during the interview. But he

18

insisted that he was lying during the interview to protect himself and because he believed Devon had already "snitched" on him. According to Christopher, he was telling the truth now because he had decided to take responsibility for his actions no matter the consequences.

However, he also testified that he is a gang member, and as a gang member, "snitching" is highly frowned upon. During re-direct examination, the State followed up on this line of questioning, and Christopher acknowledged that "[snitches] don't make it" in prison and that testifying against Devon would be considered "snitching." When the State asked if he would be considered a "snitch" based on the testimony he had provided that day, Christopher responded, "Nope."

### F.    Deputy Daniel Jaramillo

The State then called Deputy Daniel Jaramillo, the jail administrator for the Refugio County Jail, which is where Christopher was taken after he refused to testify on the first day of trial. Devon objected that Deputy Jaramillo was not included on the State's list of witnesses, and the trial court overruled the objection.

Deputy Jaramillo testified that Devon's counsel had visited Christopher at the county jail for approximately thirty to forty-five minutes after the first day of trial. The State suggested that Christopher had just testified that he had never spoken to Devon's counsel before that morning, and Deputy Jaramillo, who did not hear Christopher's testimony, agreed that any such testimony would be a lie.

During cross-examination, Deputy Jaramillo agreed that Devon's counsel had the right to speak to witnesses, just as the State had spoken with Christopher two weeks prior

19

to trial. He also agreed that the conversation between Devon's counsel and Christopher was not recorded, and he had no idea what they discussed. Finally, Devon's counsel implied through his questioning that the State was misrepresenting Christopher's testimony about when he first spoke with Devon's counsel. The trial court suggested Devon get a transcript of Christopher's prior testimony to clarify the issue, but none was offered.

## G. Lieutenant Greg Kouba

Greg Kouba, a lieutenant with the Victoria County Sheriff's Office, and Texas Ranger Drew Pilkington interviewed Devon and Christopher at the Goliad County Jail several days after their arrests. They interviewed Devon first, and according to Lieutenant Kouba, Devon initially denied being present at the Cooley residence. Instead, Devon suggested that Christopher was with another person named Dale Delgado. Devon eventually admitted that he was at the Cooley residence and saw Christopher come out of the shop with a rifle. But he told the investigators that he tried to convince Christopher not to take the Jeep, and after they left the Cooley residence, he and Christopher "went in two different directions." Devon also told the investigators that he never went to the Tucker residence and that he did not speak to Christopher again until he called Christopher for a ride because his car had run out of gas.

When the investigators interviewed Christopher, he gave a different version of events—one that largely mirrored the written statement he later signed. He also provided additional details that were not in the written statement. He told the investigators that when they were at the Cooley residence, Devon went inside the shop with him, and Devon

was the one who saw the gun and instructed Christopher to take it. He also admitted that he shot Tucker because he thought she had seen him.

During cross-examination, Lieutenant Kouba acknowledged that Christopher gave inconsistent statements at times during the interview. Lieutenant Kouba also acknowledged that Christopher told the investigators that he could not clearly remember the events because he was high that morning. Finally, Lieutenant Kouba agreed that "it's a pretty good distance" from the gate to the Tucker residence.

## H.     Attorney Sid Arismendez

The State's last witness was Sid Arismendez, one of two attorneys who represented Christopher during his case. Arismendez acknowledged that one of the attorneys typed Christopher's written statement but said that Christopher provided them with the narrative. According to Arismendez, they met with Christopher and took handwritten notes of Christopher's account, and these notes were used to prepare the typewritten statement. On the day of Christopher's plea, the attorneys reviewed the typewritten statement with Christopher "in detail" for over an hour, and Christopher approved the statement, signed it, and "voluntarily" read it into the record. Before accepting the plea, the trial court admonished Christopher, and Christopher acknowledged that the statement was his and that he was making it "of his own free will and accord."

During cross-examination, Arismendez acknowledged that if Christopher had elected to go to trial on the capital murder charge, it would have been an especially difficult case to defend because Christopher had provided a verbal confession to the police. He

further acknowledged that he generally advises his clients to accept a plea agreement if he thinks the terms of the agreement are in the client's best interest.

## I.      Christopher (recalled)

After the State rested, Devon recalled Christopher as his first witness. Christopher disputed Arismendez's version of events. He said that he told his lawyers that there were inaccuracies in the written statement, and they told him that he had to sign the statement as-is if he wanted the plea agreement to go forward that day, but that he could later change "anything" in the statement. Christopher also agreed that when Devon's counsel visited him in jail after the first day of trial, he brought up the inaccuracies in the statement, not Devon's counsel.

## J.      Judy Sheleheda

Judy Sheleheda is Devon's great aunt. She testified that Devon inherited mineral rights from his father, and she received a $50,000 check on Devon's behalf from an oil and gas company. She confirmed that Devon was planning to travel to Austin the day after the incident to take possession of the check and cash it at a bank.

## K.      Devon

Devon elected to testify, and his testimony largely tracked Christopher's testimony as far as his lack of involvement in the burglaries. Devon was released from prison on an unrelated matter on September 13, 2019, and he had been staying at Christopher's house "for about two-and-a-half days" before the incident. He admitted that they started doing methamphetamine soon after he arrived, and they "never stopped," not even to sleep.

According to Devon, the morning of the incident, Christopher was out of drugs, and

22

Devon only had "a little bit left." Christopher told him about a drug dealer who would give them a large amount of drugs on credit. Devon said he had never sold drugs, so his only intention was to secure more drugs for his personal use. Christopher, on the other hand, "was probably going to use and sell and do whatever he could to get some more money to keep on feeding his high."

They left Christopher's place in a red Pontiac, and Devon acknowledged that he "was smoking meth" while they drove around looking for this drug dealer. By the time they realized the dealer was in the Houston area, the car was already on empty, and Devon said to Christopher, "Well, let's ride, and maybe we can find somebody that will give us some gas, you know, ask them politely somebody [sic] for gas." Devon acknowledged that he directed Christopher to pull into the Cooley residence, and Christopher "went down the driveway and kind of backed up to [Cooley's] shop." Devon suggested that Christopher ask for the gas because Devon might "scare them" with the tattoos on his face.

Devon stated that when he next saw Christopher, Christopher "hopped in the car" and "had a rifle in his hand." Devon asked Christopher what was going on, but Christopher didn't respond and "just put the car in drive and just drove up behind Mr. Cooley's Jeep." Devon saw Christopher get out of the car with the rifle in his hand but thought, "Maybe he's still going to try to ask these people for some gas."

Devon said he then saw Christopher raise and point the rifle, so he got out of the car, ran over to Christopher, and pushed the gun down. He said he again asked Christopher what was happening, but Christopher did not respond and "just turned around

23

and bolted off towards Mr. Cooley's Jeep." Christopher got in the Jeep, turned it on, and started to drive away.

Devon acknowledged that he followed Christopher off Cooley's property and down Coletoville Road. According to Devon, they were not communicating, and Christopher suddenly "just takes a hard right turn into the Tucker family's residence and barrels through the gate." Devon said that he stopped the car on the shoulder of the road and watched Christopher drive down a long driveway towards "somebody's homestead." Devon claimed that he did not know what Christopher was doing on the property: "I thought maybe, you know, he was going to ditch the Jeep, or I don't know if he might have known anybody in this family, or I don't really know what his intentions were."

Devon said he waited for Christopher "for a good while, you know, because I was in his car," and Christopher "didn't really tell me, you know, what to do." Christopher reappeared after "10 or 15 minutes," and during that time, Devon said he did not attempt to call Christopher, and they did not communicate otherwise. When Christopher got back to the gate in the Jeep, the gate had closed, and Devon acknowledged that he used the red Pontiac to push the gate open for Christopher. But he claimed that he "had no clue" that Devon had broken into the Tucker residence or shot someone. He also testified that he never told Christopher to break into the Tucker residence or take the rifle inside.

According to Devon, he first learned about the shooting when they met up at the church parking lot. At that point, they went their separate ways. But shortly after, Devon ran out of gas and called Christopher to come pick him up. Devon acknowledged that he lied to Deputy Guerra about why he was in the area because he did not want to be

24

associated with Christopher's crimes. He also acknowledged that he initially lied during his interview with Lieutenant Kouba and Ranger Pilkington but said he eventually cooperated and offered to testify against Christopher.

During cross-examination, the State showed Devon the photo from the Facebook post, and he acknowledged that he was the person in the photo and that it was taken the morning of the incident. He also acknowledged that he was wearing a ski mask in the photo but said they were "just goofing around." He explained that the caption in the Facebook post, "MOB for life," was merely the title of a song that he liked at the time. The State then asked Devon what the song was about, and after he said he was unsure, the trial court allowed the State to read what it claimed were some of the lyrics from the song over Devon's relevancy objection. The lyrics described a shooting, among other things, but Devon said he did not recognize those as the same lyrics with which he was familiar.

After the State walked Devon through the incident at Cooley's residence and he reiterated that Christopher acted alone in taking the rifle and Jeep, the State asked Devon why he chose to follow Christopher to the Tucker residence instead of simply driving in the opposite direction. Devon responded, "Well, because I'm in his car, and I didn't want him, you know—I didn't know what to do with the car." Devon also said he did not call the police or tell Mr. Cooley what had happened because he was on parole.

The State pressed Devon on his explanation for why he waited for Christopher at the Tucker residence after he had just witnessed Christopher steal a rifle and Jeep at the Cooley residence and then force his way onto the Tucker property. Devon maintained that he did not know that Christopher was about to burglarize another house and that he

25

felt compelled to stay because he was in Christopher's car.

Devon acknowledged that after he opened the gate for Christopher, he followed Christopher to the church parking lot, and Christopher told him, "I think a lady seen [sic] me, and I shot her." Devon said he was unsure whether to believe Christopher because Christopher "had been delusional" that day. Earlier that morning, Devon had seen the incident where Christopher was talking to his hand as if it was a phone.

Devon disputed the State's suggestion that he tried to hide the red Pontiac behind some bushes when the vehicle ran out of gas: "I tried to get if off as much of the road as I could, and that's where it ended up." He acknowledged that he did not report any of Christopher's crimes to Deputy Guerra or inform him that someone may have been shot. He also admitted that he failed to inform Deputy Guerra about the location of the red Pontiac.

Devon further acknowledged that he was untruthful in his interview with police. He initially "lied" about not being at the Cooley residence. After he eventually agreed to cooperate with police regarding the murder, he was not forthcoming about his involvement. Specifically, he told the police that Christopher had confessed to the shooting but failed to mention that he was present at the Tucker property when the incident occurred.

## L.    The Verdict

The jury was instructed on the charged offense of capital murder and the lesser included offenses of felony murder and burglary of a habitation. The jury found Devon guilty of felony murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.03(c).

During punishment, the State filed a notice of enhancement alleging that Devon was previously convicted of tampering with evidence with intent to impair, a third-degree felony. *See id.* §§ 12.42(c)(1) (enhancing the punishment range for a first-degree felony to fifteen years to life when the defendant has a prior felony conviction other than a state jail felony), 37.09(a)(1), (c) (establishing tampering with evidence with intent to impair as a third-degree felony). The jury found the allegation true and assessed Devon's punishment at fifty years' confinement and a fine of $10,000.00. *See id.* § 12.42(c)(1).

**M.    Motion for New Trial & Motion to Recuse**

Devon filed a timely motion for new trial based on an allegation of judicial bias.[2] In support of his claim, Devon argued that the trial judge initiated an ex parte communication with the State, and collectively, they "forced" Christopher to testify against Devon. Devon submitted that this alleged misconduct was apparent from the face of the trial record.

Devon also provided declarations from four witnesses who attended the trial. These witnesses collectively alleged that they observed certain events, which, in their opinion, demonstrated the trial court's bias: (1) during Devon's testimony, and in front of the jury, the trial judge "***audibly*** gasped and sighed in apparent disapproval"; (2) during this same period, the trial judge "reached in the air as if he was saying Devon was 'grasping for straws'"; (3) during a recess, the trial judge, the prosecutor, and members of Tucker's family walked out of the courtroom and went "into a closed room across the hall together"; (4) after trial had ended one day, the trial judge "had a long conversation"

---

[2] The motion also included two other grounds for a new trial. Devon subsequently withdrew one of these grounds in a written filing with the trial court. He has not advanced either additional ground on appeal.

with members of Tucker's family outside the courthouse; and (5) during a lunch break, the trial judge and members of Tucker's family were having lunch at the same restaurant near the courthouse, and the trial judge spoke with the family members "for roughly five (5) minutes" before sitting at a separate table.

Devon also filed a contemporaneous motion to recuse or disqualify the trial judge from considering the motion for new trial based on the same allegations of judicial bias. The trial judge refused to voluntarily recuse himself, and the matter was referred to Judge Sid Harle, presiding judge of the Fourth Administrative Region. Judge Harle elected to hear the matter himself and granted Devon's request for access to courthouse security footage.

The State filed a response disputing Devon's characterization of the circumstances surrounding Christopher's testimony and attached a portion of the trial transcript as proof. The State also provided affidavits from witnesses who controverted portions of the declarations described above. An investigator for the District Attorney's Office said he was present "throughout the trial" and never witnessed the trial judge comment on the weight of the evidence while Devon or any other witness testified. A secretary in the County Attorney's Office located in the courthouse said she observed "much of the trial." Like the investigator, she never witnessed the trial judge comment on the weight of the evidence during any witnesses' testimony. She acknowledged that the prosecutor and family members would meet in the County Attorney's Office but said the trial judge "was never present" for those meetings. Instead, she did observe the trial judge enter the office to use a private bathroom "and to get a candy." Finally, a sergeant for the Goliad County

Sheriff's Office said he reviewed the courtroom security footage from the trial and found no evidence that the trial court made any gestures while Devon testified or that the trial judge "escorted" Tucker's family into the County Attorney's Office.

Judge Harle held an evidentiary hearing on the motion to recuse. In addition to the previously submitted declarations, Devon introduced several short videos to support his claim of judicial bias. Three of the videos were taken by the motion activated security camera inside the courtroom during Devon's testimony. According to Devon's appellate counsel, these silent videos purportedly show the trial judge physically "react[ing] to Devon's testimony." Devon also introduced a cell phone video that depicts the trial judge briefly interacting with members of Tucker's family outside the courthouse minutes before the jury returned its verdict on Devon's punishment.

Three of Devon's four witnesses, all related to Devon, appeared and testified consistent with their declarations. The witnesses who observed the trial judge interacting with Tucker's family outside the courthouse and during a lunch break acknowledged that they were not close enough to overhear what was said. The witness who observed the trial judge, the prosecutor, and the Tucker family enter a closed room together during a recess, admitted that she had no knowledge of what transpired after they entered the room. None of the witness could say whether a jury member observed any of these alleged interactions.

Devon's trial counsel also testified. He acknowledged that he did not notice the trial judge react to Devon's testimony but said that his attention was focused on Devon and the jury. He agreed that had he noticed the trial judge commenting on the weight of

29

the evidence, he would have objected.

The State called the sergeant from the Goliad County Sheriff's Office to testify. Consistent with his affidavit, the sergeant said he reviewed the courthouse security footage, and he did not observe the trial judge make the gestures alleged by Devon's witness. Nor did he observe the trial judge "escort" Tucker's family into the County Attorney's Office. He explained that the County Attorney's Office has the only private bathroom on the second floor of the courthouse and that judges and attorneys generally use that bathroom rather than the public one. He further testified that the cell phone video depicts the west side of the courthouse and that the jury room is on the east side of the courthouse, meaning the jury would not have been able to observe the trial judge's interaction with Tucker's family while it was deliberating Devon's sentence. Finally, as far as the alleged interaction between the trial judge and Tucker's family during a lunch break, the sergeant acknowledged that the Blue Quail Delicatessen was the only nearby restaurant open for lunch during Devon's trial; however, he was unaware whether any jury members were eating lunch there on that day.

After taking the matter under advisement, Judge Harle denied the motion to recuse and referred the case back to the trial judge. The motion for new trial was overruled by operation of law, and this appeal ensued.

## II.    SUFFICIENCY OF THE EVIDENCE

By his first issue, Devon argues that the evidence was legally insufficient to support his conviction for felony murder.

30

## A. Standard of Review

In conducting a sufficiency review, we view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018). We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences from the evidence in a manner that supports the verdict. *Id.* "We may not re-weigh the evidence or substitute our judgment for that of the factfinder." *Id.* We consider all the evidence in the record, including evidence that was properly and improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

We measure the sufficiency of the evidence against "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict its theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

## B. The Hypothetically Correct Jury Charge

Before turning to the evidence, we must resolve the parties' disagreement over the hypothetically correct jury charge in this case. *See id.*

The jury charge included an instruction under the "intent to promote or assist"

theory of party liability under penal code § 7.02(a)(2) but not a conspiracy theory of party liability under penal code § 7.02(b). *See* TEX. PENAL CODE ANN. §§ 7.02(a)(2) (providing that a person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense"), 7.02(b) ("If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."). The distinction between these two theories of party liability is significant in this case. In *Nava v. State*, the Texas Court of Criminal Appeals held that, although felony murder is a "non-intent crime," proceeding against an accomplice under an "intent to promote or assist" theory of party liability requires the State to prove that the accomplice acted with "an intent to promote or assist, not only the commission of the underlying felony and the unreasonably dangerous act, but also the result of the offense of felony murder—the death of an individual." 415 S.W.3d 289, 299–300 (Tex. Crim. App. 2013) (observing that "[w]ith some offenses, [such as felony murder,] this may mean that [the] State will have to show a greater culpable mental state for the accomplice than for the primary actor" and that "[t]he State assumes this higher burden by pursuing an intent-based theory of party liability for a non-intent crime"). In his brief, Devon contends that, regardless of whether the evidence shows that he acted with intent to promote or assist the underlying felony of burglary, the evidence is insufficient to

32

show that he intended Tucker's death.

The State does not address this point but instead argues that the hypothetically correct jury charge would include an instruction on a conspiracy theory of party liability. Under this theory, the State would only have to prove a conspiracy between Devon and Christopher to burglarize Tucker's house, that the murder was committed in furtherance of the burglary, and that the murder "should have been anticipated" by Devon under the circumstances. *See* TEX. PENAL CODE ANN. § 7.02(b). Importantly, this theory of party liability would not require the State to prove that Devon intended Tucker's death. *See id.* (providing that "all conspirators are guilty of the felony actually committed, though having no intent to commit it"). The State argues that under its version of the hypothetically correct jury charge, one that includes conspiracy liability, the evidence was clearly sufficient to support Devon's conviction for felony murder.

In reply to the State's argument, Devon raises two points. First, he notes that the jury was only charged under § 7.02(a)(2). If we understand his argument correctly, Devon suggests that a hypothetically correct jury charge is confined to only the theories of criminal liability submitted to the jury. However, that is not the standard for a hypothetically correct jury charge articulated in *Malik*. *See* 953 S.W.2d at 240. In rejecting this very argument in a prior appeal, we explained that the *Malik* "standard was formulated to ensure that a judgment of acquittal is reserved for those situations in which there is an actual failure in the State's proof of the crime rather than a mere error in the jury charge submitted." *Swartz v. State*, 61 S.W.3d 781, 785 (Tex. App.—Corpus Christi–Edinburg 2001, pet. ref'd) (discussing *Malik* and concluding that a hypothetically correct jury charge

33

may include "a theory not submitted to the jury").

As previously mentioned, a hypothetically correct charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict its theories of liability, and adequately describes the particular offense for which the defendant was tried. *Malik*, 953 S.W.2d at 240. Although Devon was charged only as a principal in the indictment, "each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice." TEX. PENAL CODE ANN. § 7.01(c). In other words, the hypothetically correct charge in this case, as authorized by the indictment, would include any theories of party liability supported by the evidence, regardless of whether or not the theory was pleaded in the indictment. *See Adames v. State*, 353 S.W.3d 854, 861–62 (Tex. Crim. App. 2011) (observing that "both state and federal law specify that due process does not require a defendant's culpability as a party to the offense to be plead in the charging instrument" and finding the evidence legally sufficient to convict appellant of capital murder under a theory of party liability even though he was only charged as a principal in the indictment); *see also In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013) (orig. proceeding) (concluding the trial court erred in denying the State's request for a conspiracy theory of party liability because "[r]egardless of whether it is pled in the charging instrument, liability as a party is an available legal theory if it is supported by the evidence").

As Devon concedes in his brief, one of the State's theories at trial was a "conspiracy and concert of action" between Devon and Christopher to burglarize Tucker's

home. According to Devon, "by the time of its closing, the State abandoned the joint burglary spree conspiracy theory and instead argued [party liability under § 7.02(a)(2)]." Be that as it may, a hypothetically correct jury charge does not unnecessarily increase the State's burden of proof or restrict its theories of liability, and by Devon's own admission, the State advanced a conspiracy theory of party liability at trial. *See id.* As such, the State's conspiracy theory is part of the hypothetically correct jury charge regardless of whether it was actually submitted to the jury. *See Swartz*, 61 S.W.3d at 785 (concluding that a hypothetically correct jury charge included an instruction on principal liability even though the jury was only instructed on party liability).

In his second point, Devon suggests that conspiracy liability is not an appropriate theory of party liability in felony murder cases because *Nava* only discussed an "intent to promote or assist" theory of party liability. *Nava* does not stand for that proposition. In that case, the Texas Court of Criminal Appeals examined a complaint about jury charge error and clarified the elements of felony murder if the State proceeds under an "intent to promote or assist" theory of party liability. 415 S.W.3d at 292, 298–99. Nowhere in the opinion does the Court suggest that § 7.02(a)(2) is the only way to prove party liability for felony murder. *See id.* at 292–308. To the contrary, § 7.02(b) is commonly used to convict a co-conspirator of felony murder when the murder occurs during the commission of an armed robbery. *See, e.g.*, *Ruiz v. State*, 579 S.W.2d 206, 209 (Tex. Crim. App. [Panel Op.] 1979) (holding direct evidence of appellant's participation in aggravated robbery would permit jury to infer that appellant should have anticipated the murder); *Green v. State*, 682 S.W.2d 271, 285–86 (Tex. Crim. App. 1984) (holding jury could rationally

35

conclude that murder should have been anticipated as possible result of robbery when appellant admitted entering a house with co-conspirators armed with a gun for the purpose of stealing firearms from the house); *Love v. State*, 199 S.W.3d 447, 453 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) ("Evidence that a defendant knew his co-conspirators might use guns in the course of the robbery can be sufficient to demonstrate that the defendant should have anticipated the possibility of murder occurring during the course of the robbery.").

Therefore, we conclude that, in addition to an instruction under § 7.02(a), a hypothetically correct jury charge in this case would instruct the jury to find Devon guilty of felony murder under § 7.02(b) if the jury found beyond a reasonable doubt that: (1) Christopher and Devon attempted to carry out a conspiracy to burglarize Tucker's residence; (2) in that attempt, Christopher committed felony murder; (3) the murder was committed in furtherance of the conspiracy; and (4) the murder should have been anticipated as a result of carrying out the conspiracy. *See* TEX. PENAL CODE ANN. § 7.02(b); *Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013).

## C.    The Evidence Was Sufficient Under § 7.02(b)

Viewing the evidence in the light most favorable to the verdict, we conclude that a reasonable juror could have found the essential elements of the crime beyond a reasonable doubt.[3]

---

[3] In light of our holding, we express no opinion on whether the evidence was also sufficient to support Devon's conviction under § 7.02(a)(2). *See* TEX. R. APP. P. 47.1.

### 1. Christopher and Devon Conspired to Burglarize Tucker's Home

A criminal conspiracy arises when two people agree to commit an offense and "one or more of them performs an overt act in pursuance of the agreement." TEX. PENAL CODE ANN. § 15.02(a)(2). It is undisputed that Christopher burglarized the Tucker residence; the only question is whether the evidence supports a finding that Devon agreed to commit the offense. *See id.* Both men testified at trial that Christopher acted independently; however, Christopher's typewritten statement, which was consistent with his prior statement to police, painted a different picture.

In the statement, he claimed that on the morning in question, he and Devon made a "plan . . . to try to get some money," and this involved "trying to get things to sell." This "plan" first came to fruition when Devon "picked" Cooley's residence and directed Christopher how to get there. According to Christopher's statement, he only stole Cooley's Jeep "because Devon wanted it." According to Lieutenant Kouba, Christopher told him that it was also Devon's idea to steal Cooley's rifle.

Christopher's written statement recounts that, after they fled Cooley's residence, the pair "drove around and looked for other houses that looked like they had money." Although they were in separate vehicles at this time, it was undisputed that both men had cell phones. Together they selected the Tucker residence "because the gate was nice."

Christopher forced his way through the gate in the Jeep, and both men "got out of the cars" and began "looking for stuff that was easy to sell." Christopher then broke into the Tucker residence, spotted two gun safes, and intended to steal any guns he could find. According to Christopher's written statement, during this time, "Devon waited outside

37

and kept a look out." It is undisputed that when Christopher left the Tucker residence, Devon used the red Pontiac to push the gate open so Christopher could escape in the Jeep. Afterwards, they met at a church parking lot and discussed what occurred inside the Tucker residence.

Christopher was unequivocal in his written statement about Devon's involvement: "What we did was both of our ideas." Although Christopher recanted his prior statements at trial, "it is up to the fact finder to determine whether to believe the original statement or the recantation." *Saldana v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi–Edinburg 2008, pet. ref'd) (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)); *see Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020) ("[T]he jury can believe all, some, or none of a witness's testimony." (citing *Esquivel v. State*, 506 S.W.2d 613, 615 (Tex. Crim. App. 1974)). Based on its verdict, the jury credited Christopher's prior statements over his recantation, and this evidence was sufficient to show a conspiracy between Christopher and Devon to burglarize the Tucker residence.

### 2. Christopher Murdered Tucker in Furtherance of the Conspiracy

It is undisputed that, during the commission of the burglary, Christopher shot a rifle in the direction of Tucker—i.e., he committed an act clearly dangerous to human life that resulted in Tucker's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(3). And although Christopher claimed the shooting was accidental, both Devon and Lieutenant Kuoba testified that Christopher admitted to intentionally shooting Tucker because she had seen him inside the residence. *See Sifuentes v. State*, 615 S.W.3d 914, 919 (Tex. Crim. App. 2021) (reviewing courts defer to the jury's resolution of conflicting testimony). Killing a

witness to one's burglary is an offense committed in furtherance of that unlawful purpose. *See* TEX. PENAL CODE ANN. § 7.02(b). Therefore, the evidence was sufficient to prove the second and third elements of the offense.

### 3. Devon Should Have Anticipated Tucker's Death

As to the final element of the offense, Devon argues that there is "no evidence" that he anticipated Tucker's death. But "[s]ection 7.02(b) does not require the State to prove that [Devon] actually anticipated the secondary felony, only that the crime is one that *should* have been anticipated." *Anderson*, 416 S.W.3d at 889. Each case is fact specific, and we consider the totality of the circumstances to determine whether "a particular offense committed by a co-conspirator was 'reasonably foreseeable' within the scope of the unlawful agreement." *Id.* (adopting the federal rule of co-conspirator liability under *Pinkerton v. United States*, 328 U.S. 640 (1946)). As Devon correctly points out, there is no bright-line rule "that a participant in a conspiracy to steal property should *always* anticipate that a murder might occur." *George v. State*, 634 S.W.3d 929, 938 (Tex. Crim. App. 2021). However, considering the totality of the circumstances in this case, all of which were known to Devon, we conclude that Devon should have known there was an extreme degree of risk that Christopher may encounter a person in the Tucker residence and shoot them.

Armed robberies and burglaries are inherently dangerous, and courts have routinely found that a co-conspirator should reasonably anticipate that a murder may occur during the commission of the offense. *Fernandez v. State*, 621 S.W.3d 818, 829 (Tex. App.—El Paso 2021, pet. ref'd) ("The evidence establishes Appellant should have

39

anticipated the possibility of a murder, especially knowing her co-conspirators possessed deadly weapons . . . ."); *Canfield v. State*, 429 S.W.3d 54, 68–69 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *Johnson v. State*, 421 S.W.3d 893, 898–99 (Tex. App.—Houston [14th Dist.] 2014, no pet.). In this case, it is undisputed that Devon knew that Christopher had stolen a rifle at the Cooley residence before they continued to the Tucker residence. In fact, Devon testified that he observed Christopher raise and point the rifle while they were at Cooley's place, and he had to quickly intervene to prevent Christopher from firing the weapon.

It was also apparent to Devon that Christopher's mental faculties were not intact that morning. Christopher testified that on the morning in question, he had been awake for eight straight days doing methamphetamine. He then decided to smoke methamphetamine for the first time, and this made him "extremely" high. Christopher was so sleep deprived and intoxicated that morning that Devon described him as "delusional," recounting the incident where he watched Christopher talk to his hand as if it was a phone. Finally, the day and time of the burglary—a Sunday morning—increased the likelihood that Christopher would encounter a person inside the home. From the totality of these facts, a rational juror could have concluded beyond a reasonable doubt that Devon should have anticipated that a murder might occur during the burglary.

## D. The Accomplice-Witness Rule

The parties disagree about whether the accomplice-witness rule applies in this case. "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense

40

committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14. In the jury charge, Christopher was declared an accomplice witness as a matter of law, and the jury was instructed on the application of the accomplice-witness rule. *See Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) ("A witness who is indicted for the same offense or a lesser-included offense as the accused is an accomplice as a matter of law."). Nevertheless, the State contends that Christopher's testimony was largely unhelpful to the State, and therefore, his prior statements implicating Devon were out-of-court statements not subject to the accomplice-witness rule. Devon counters that regardless of how Christopher testified, his testimony allowed the State to impeach him with his out-of-court statements. According to Devon, under these circumstances, Christopher's out-of-court statements constituted "testimony" and should be treated with the same scrutiny under the accomplice-witness rule.

Both parties rely on the Texas Court of Criminal Appeals decision on rehearing in *Bingham v. State* to support their contrary positions. *See* 913 S.W.2d 208 (Tex. Crim. App. 1995). In *Bingham*, the defendant was charged with arson, and a police officer testified that during his investigation, the defendant's wife admitted that "she and [the defendant] had planned to burn the trailer for some time before [the defendant] actually set fire to it." *Bingham v. State*, 909 S.W.2d 903, 904 (Tex. Crim. App. 1994) (plurality op.), *rev'd on reh'g*, 913 S.W.2d 208. The wife did not testify at trial, and the trial court refused the defendant's request for an instruction on the accomplice witness rule. *Id.* at 905. In examining the meaning of "testimony" in the context of Article 38.14, the Court

held that an out-of-court statement by a non-testifying accomplice was not subject to the accomplice witness rule. *Bingham*, 913 S.W.2d at 210 ("[W]e construe the 'testimony' contemplated by Article 38.14 to be of the narrower, evidentiary kind, the kind adduced in open court by live witness under oath.").

The State contends that under *Bingham*, any out-of-court statement by an accomplice witness falls outside the accomplice-witness rule, regardless of whether the accomplice also testifies. Devon notes that this case is distinguishable from *Bingham* because Christopher testified at trial, and his typewritten statement was admitted as impeachment evidence during his testimony. Furthermore, the veracity of his typewritten statement was hotly contested at trial, with both parties examining Christopher at length about the contents of the statement. Assuming without deciding that the rule applies to Christopher's out-of-court statements, we conclude that other evidence in the record sufficiently connected Devon to the offense.

In conducting a sufficiency review where the accomplice-witness rule applies, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). "While the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense." *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). Each case is fact specific, and

corroboration may be shown through direct or circumstantial evidence. *Smith*, 332 S.W.3d at 442. "Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration." *Dowthitt*, 931 S.W.2d at 249. As with any sufficiency review, "when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence." *Smith*, 332 S.W.3d at 442.

It is undisputed that Devon and Christopher were together before, during, and after the commission of the burglary at the Tucker residence, so we look to the record for other suspicious circumstances that would tend to connect Devon to the crime. *See Dowthitt*, 931 S.W.2d at 249. Devon testified that on the morning in question, he and Christopher were on a methamphetamine binge, and they needed to drive to the Houston area to procure more drugs. Low on gas and out of money, Devon acknowledged that he directed Christopher to Cooley's residence but said it was only to ask for gas. *See Reed v. State*, 744 S.W.2d 112, 127 (Tex. Crim. App. 1988) ("Evidence which *merely* goes to show motive or opportunity of the accused to commit the crime is insufficient alone to corroborate the accomplice witness. It may, however, be considered in connection with other evidence tending to connect the accused with the crime.").

According to Devon, he was surprised when Christopher stole the rifle and Jeep instead of simply asking for gas. But rather than separate from Christopher after witnessing these allegedly unexpected crimes, Devon said he elected to follow Christopher to the Tucker property because he "didn't know what to do with [Christopher's] car." Once there, Devon watched Christopher force his way on to the

43

Tucker property and waited for him by the gate for "10 or 15 minutes." Again, Devon insisted that he stayed "because [he] was in [Christopher's] car," and Christopher "didn't really tell [him], you know, what to do." When Christopher reappeared at the gate, Devon aided his escape by pushing the gate open from the outside and then met Christopher at the church parking lot. The jury was free to weigh the credibility of Devon's explanation for why he voluntarily stayed with Christopher throughout the commission of these crimes at two separate locations. From these suspicious circumstances, a rational juror could infer that Devon was not merely present at the Tucker property but was also acting in concert with Christopher. *See Lozano v. State*, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref'd) (stating that "implausible explanations are also probative of wrongful conduct and are circumstances of guilt").

After the crimes, Devon displayed behavior that a rational juror could find suspicious because it demonstrated a consciousness of guilt. *See Simpson v. State*, 181 S.W.3d 743, 754 (Tex. App.—Tyler 2005, pet. ref'd) (noting that evidence demonstrating consciousness of guilt can be used to corroborate accomplice witness testimony). After running out of gas, Devon concealed his car behind some brush and then lied to Deputy Guerra about why he was in the area. *See Lozano*, 359 S.W.3d at, 814 (attempting to conceal incriminating evidence shows consciousness of guilt). When questioned by police, Devon initially denied that he was at either crime scene, and even though he later conceded that he was present at the Cooley residence, he continued to maintain that he did not follow Christopher to the Tucker property. *See Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984) (finding accomplice witness testimony sufficiently

corroborated where, among other suspicious circumstances, defendant lied to police about being with the accomplice at the time of the offense).

Based on the forgoing, we hold that a rational juror could conclude that the cumulative force of this non-accomplice evidence tended to connect Devon to the offense. Devon's first issue is overruled.

### III.    JUDICIAL BIAS

By his second issue, Devon complains that the trial judge in this case, Judge Robert "Bobby" Bell, engaged in judicial misconduct that deprived him of his due process right to an impartial judge and a fair trial. First, Devon claims that Judge Bell aided the State in "coercing" Christopher's testimony. Next, Devon argues that Judge Bell was openly hostile towards his trial counsel. He also claims that Judge Bell aided the State in getting the Facebook post admitted into evidence. Finally, Devon submits that Judge Bell displayed partiality by communicating with Tucker's family while the trial was ongoing. While we agree that Judge Bell's conduct was not always exemplary, we conclude that Devon has failed to demonstrate judicial bias or partiality.

### A.    Standard of Review & Applicable Law

"Due process requires a neutral and detached hearing body or officer." *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)). This principle is embodied in both the Due Process Clause of the United States Constitution and the Due Course of Law Clause of the Texas Constitution. *Earley v. State*, 855 S.W.2d 260, 262 (Tex. App.—Corpus Christi–Edinburg 1993, pet. dism'd); *see* U.S. CONST. amend. XIV; TEX. CONST. art. I, § 19. Although statutes and rules may

45

impose additional safeguards, the Due Process Clause creates a constitutional floor that guarantees a "fair trial in a fair tribunal." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)). In practice, this means, among other things, a trial "before a judge with no actual bias against the defendant" or in favor of the State. *Id.* at 905 (citing *Aetna Life Ins. v. Lavoie*, 475 U.S. 813, 828 (1986)). "When a claim of judicial bias is raised, we review the entire record to determine if it shows the judge's bias or prejudice denied the defendant due process. Absent a strong showing to the contrary, we presume the trial judge was neutral and impartial." *Tovar v. State*, 619 S.W.3d 783, 792 (Tex. App.—San Antonio 2020, pet. ref'd) (citing *Abdygapparova v. State*, 243 S.W.3d 191, 198 (Tex. App.—San Antonio 2007, pet. ref'd)); *Earley v. State*, 855 S.W.2d 260, 262 (Tex. App.—Corpus Christi–Edinburg 1993, pet. dism'd) ("[I]n the absence of a clear showing to the contrary, we will presume the trial judge was a neutral and detached officer." (citing *Fielding v. State*, 719 S.W.2d 361, 366 (Tex. App.—Dallas 1986, pet. ref'd))); *see Brumit*, 206 S.W.3d at 645 ("Absent a clear showing of bias, a trial court's actions will be presumed to have been correct." (citing *Thompson v. State*, 641 S.W.2d 920, 921 (Tex. Crim. App. 1982))).

A ruling or decision made in reliance on an extrajudicial source is sufficient to show bias and deprivation of due process because it results "in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966). In the absence of an extrajudicial source, a judge's rulings, remarks, or actions will "only in the rarest circumstances evidence the degree of favoritism or antagonism required" to show judicial bias or

partiality. *Gaal v. State*, 332 S.W.3d 448, 454 (Tex. Crim. App. 2011) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). They must be "so extreme as to display clear inability to render fair judgment." *Liteky*, 510 U.S. at 552.

> *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id.* at 555–56. Such a display "may well violate a rule of judicial conduct," but it will not sustain a claim of judicial bias or partiality. *Gaal*, 332 S.W.3d at 454–55.

## B.     Waiver

As a preliminary matter, the State suggests that Devon's partiality claim "raises a complicated preservation question." According to the State, Devon may have forfeited his complaint because, although he filed post-trial motions seeking Judge Bell's recusal and a new trial on the same judicial bias grounds, he failed to object "as soon as actionable bias or partiality accumulated." The State further notes that Devon characterizes his complaint as "fundamental error" even though the Texas Court of Criminal Appeals disavowed the concept of "fundamental error" several years ago in *Proenza v. State*, 541 S.W.3d 786 (Tex. Crim. App. 2017). The State presumes Devon mislabeled his complaint to avoid possible forfeiture.

Although the *Proenza* Court eliminated "fundamental error" as a freestanding, harm-based doctrine of error preservation, the *Proenza* Court also clarified that we should follow the rules of error preservation previously established in *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993). *Proenza*, 541 S.W.3d at 793–97. Under the *Marin* framework,

47

errors are placed in one of three categories depending on the rights involved: "(1) absolute requirements and prohibitions; (2) rights of litigants which must be implemented by the system unless expressly waived; and (3) rights of litigants which are to be implemented upon request." *Id.* at 792 (quoting *Marin*, 851 S.W.2d at 279). Procedural default only applies to the third category of rights. *Marin*, 851 S.W.2d at 279. On the other hand, so-called category-one *Marin* rights, described as "systemic requirements and prohibitions" that "are essentially independent of the litigant's wishes," cannot be forfeited or waived. *Id.* In the middle, category-two rights "must be protected by the system's impartial representatives unless expressly waived by the party to whom they belong." *Id.* Thus, *Proenza* did not eliminate the concept of non-forfeitable claims; it "simply change[d] the operative question in determining whether a claim . . . is subject to procedural default." *Proenza*, 541 S.W.3d at 797.

The parties have failed to address how a claim of judicial bias fits within the *Marin* framework, and as far as we know, the Texas Court of Criminal Appeals has yet to reach this question. *See Brumit*, 206 S.W.3d at 644–45 ("We need not decide today whether an objection below is required to preserve an error of this nature on appeal because the record here does not reflect partiality of the trial court or that a predetermined sentence was imposed."); *see also Moreland v. State*, 12-20-00200-CR, 2021 WL 3265545, at *3 (Tex. App.—Tyler July 30, 2021, no pet.) (mem. op., not designated for publication) (assuming without deciding that a judicial bias claim could be raised for the first time on appeal). Because we do not have the benefit of the parties' briefing on this issue, and the answer to the question is not outcome determinative, we assume without deciding that

48

Devon's complaint is properly before us.

**C.    Christopher's Testimony**

The main thrust of Devon's judicial bias complaint is that Judge Bell acted "as a prosecutor in league with the State" by "coercing" Christopher's testimony. As proof, Devon argues that Judge Bell (1) failed to properly address Christopher's invocation of his Fifth Amendment right against self-incrimination, (2) initiated an ex parte communication with the State regarding the terms of Christopher's plea bargain, and (3) improperly admonished Christopher about the potential consequences of refusing to testify. Devon notes that without Christopher's testimony, the State would have been prohibited under the Confrontation Clause from introducing Christopher's prior statements implicating Devon as an accomplice. *See Hale v. State*, 139 S.W.3d 418, 421–22 (Tex. App.—Fort Worth 2004, no pet.) ("The admission of a testimonial statement by an accomplice or codefendant as evidence of guilt of the defendant on trial, absent opportunity by the defendant to cross examine the declarant, is 'sufficient to make out a violation of the Sixth Amendment.'" (quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004))). We address each of these related contentions in turn.

**1.    Fifth Amendment**

"The Fifth Amendment provides that no person shall be compelled in any criminal case to be a witness against himself." *Butterfield v. State*, 992 S.W.2d 448, 449 (Tex. Crim. App. 1999) (citing U.S. CONST. amend. V). However, the privilege against self-incrimination ceases when criminal liability no longer exists. *Id.* For example, a co-defendant who has already pleaded guilty to the same offense is generally "not entitled

49

to assert any Fifth Amendment privilege against self-incrimination." *Bratton v. State*, 156 S.W.3d 689, 693–94 (Tex. App.—Dallas 2005, pet. ref'd) (citing *Franco v. State*, 491 S.W.2d 890, 890–91 (Tex. Crim. App. 1973)). We have previously recognized an exception to this rule: "When a co-defendant has pled guilty and has been sentenced in connection with the offense, he may still properly invoke his Fifth Amendment privilege against self-incrimination, because if his testimony contradicts any previous judicial admissions, he could be subject to the charge of perjury." *Palomo v. State*, 925 S.W.2d 329, 334 (Tex. App.—Corpus Christi–Edinburg 1996, no writ) (citing *Delrio v. State*, 866 S.W.2d 304, 306 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd)); *see Chandler v. State*, 744 S.W.2d 341, 342–343 (Tex. App.—Austin 1988, no writ). In any event, when a person erroneously claims a Fifth Amendment right against self-incrimination, the trial court may hold the person in contempt for refusing to testify. *Butterfield*, 992 S.W.2d at 450.

When Christopher was called to testify on the first day of trial and invoked his privilege against self-incrimination, Judge Bell's admonishment was consistent with the general rule for a co-defendant who has already pleaded guilty to the offense. *See Bratton*, 156 S.W.3d at 693–94. Devon did not object to this admonishment, and afterwards, Christopher explained that he was refusing to testify merely because he is not "a snitch." When the State then asked Christopher if he was afraid of Devon, Christopher reiterated, "I'm just not a snitch." Based on this unwavering explanation, Judge Bell had no reason to question whether an exception to the general rule may apply. Therefore, although perhaps premature, Judge Bell's admonishment was proper in light of

50

Christopher's subsequent explanation. *See id.* Christopher nonetheless refused to testify, and contrary to Devon's suggestion, the trial court acted within its authority by holding Christopher in contempt. *See Butterfield*, 992 S.W.2d at 450. Thus, we fail to see how a trial court's properly exercised authority could support a claim of judicial bias.

Nonetheless, Devon contends that when Christopher was initially called on the second day of trial, his response to a particular question from the State should have prompted Judge Bell to inquire whether Christopher had a legitimate reason to invoke his privilege, and had Judge Bell fulfilled this obligation, Christopher would have been excused from testifying, and his prior statement inculpating Devon would not have been admitted into evidence. Specifically, when the State presented Christopher with his prior written statement, he acknowledged that he signed it but said "there was a lot of in-discrepancies [sic] due to the attorneys." According to Devon, Judge Bell should have inferred from this response that, despite his unequivocal explanation otherwise, the real reason Christopher invoked his privilege the day prior was because he was concerned that the State may prosecute him for perjury if his testimony did not match his prior statement. This argument proves too much.

When Christopher was called on the second day, he did not initially refuse to testify; instead, he was answering the State's questions when he gave the response in question. The response itself was cryptic, and Devon's counsel did not bring it to Judge Bell's attention or ask to take the witness on voir dire to explore the possibility that there may be a legitimate explanation for his refusal to testify the day before. After Christopher later refused to testify again, Judge Bell explained his intent to strike Christopher's

51

testimony in its entirety, which would have precluded the admission of Christopher's prior written statement, because both sides had been unable to question him. Devon's counsel agreed this would be an appropriate remedy. However, having already convinced Christopher to reconsider his position on testifying, Devon's counsel insisted that Christopher be recalled to the stand.

Judge Bell then admonished Christopher that he was expected to testify truthfully and that any material misrepresentations made under oath would constitute aggravated perjury. Christopher said he understood and that he was prepared to "answer the questions." It was not until this point, *after* he agreed to fully answer questions posed by both sides, that Christopher's purported concern about being charged with perjury came into focus. At the prompting of Devon's counsel, Christopher explained for the first time that he was not merely concerned with being labeled "a snitch" but also about being charged with perjury. Nevertheless, Christopher made it clear that, after speaking with Devon's counsel, he had decided to testify regardless of these potential consequences. In other words, Christopher knowingly waived any legitimate claim of Fifth Amendment privilege he may have had. Given this sequence of events, Devon has not made the "strong showing" necessary to overcome the presumption that Judge Bell's complained-of conduct was neutral and impartial. *See Tovar*, 619 S.W.3d at 792; *Earley*, 855 S.W.3d at 262.

### 2. Ex Parte Communication with the State

When the trial resumed on the second day, Judge Bell announced that he had conferred with the State that morning about whether Christopher's plea agreement

required him to testify at Devon's trial, that the State had assured him that Christopher had agreed to do so, and that he was relying on the State's representation in deciding how to further admonish Christopher on his refusal to testify. Devon's counsel objected that he was not present for this conversation, and as such, Judge Bell and the State had engaged in an improper ex parte communication. *See* TEX. CODE JUD. CONDUCT, Canon 3(B)(8), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B. ("A judge shall not initiate, permit, or consider *ex parte* communications or other communications made to the judge outside the presence of the parties between the judge and a party, an attorney, a guardian or attorney ad litem, an alternative dispute resolution neutral, or any other court appointee concerning the merits of a pending or impending judicial proceeding.").

In response to Devon's objection, Judge Bell explained that he viewed the conversation as a matter of courtroom administration that did not require the presence of Devon's counsel because he only wanted to know the terms of the plea agreement and whether the State intended to enforce the agreement. Judge Bell reasoned that, if the agreement did not require Christopher to testify or the State did not intend to enforce the agreement, then Christopher's presence was no longer necessary, and Judge Bell would just send Christopher "back to TDC." In Judge Bell's view, he was simply trying to "expedite this matter." *See* TEX. R. EVID. 611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . make those procedures effective for determining truth; avoid wasting time; and protect witnesses from harassment or undue embarrassment.").

To begin, we note that this situation was easily avoidable. Because Devon and

53

Christopher were co-defendants, the terms of Christopher's plea agreement were readily available to Judge Bell without input from the State. As far as the nature of the communication, we do not agree with Judge Bell that this was merely an administrative matter that did not require the presence of Devon's counsel. Christopher was ostensibly the State's key witness, and Judge Bell acknowledged that he was unsure of "what would be appropriate and what would be inappropriate for [him] to do with a witness who is refusing to testify" until he spoke with the State. This substantive, rather than administrative, matter clearly concerned "the merits" of Devon's trial, and his counsel should have been a part of the conversation. *See* TEX. CODE JUD. CONDUCT, Canon 3(B)(8).

Still, we do not agree with Devon that this single, misguided ex parte communication, which was promptly disclosed to Devon's counsel, demonstrates judicial bias or structural error.[4] A claim of judicial bias based on ex parte communications between the trial judge and the State requires much more, such as guidance to the prosecutor on the presentation of th case. *See Abdygapparova*, 243 S.W.3d at 208–09 (finding judicial bias where the trial judge repeatedly sent "secretive" notes to the prosecutor "providing guidance to the prosecutor on the presentation of his case"). Here, there were no repeated ex parte communications or guidance from the trial judge to the

---

[4] This is the third time we have held Judge Bell violated the rules of judicial conduct. *See In re Marriage of Ramos & Shafer*, No. 13-22-00061-CV, 2023 WL 3240787, at *11–12 (Tex. App.—Corpus Christi–Edinburg May 4, 2023, no pet.) (mem. op.) (finding Judge Bell engaged in an ex parte communication with appellant's criminal defense attorney but affirming because appellant failed to make a "clear showing" of judicial bias or partiality); *In re A.T.M.*, No. 13-21-00008-CV, 2021 WL 2584402, at *17–19 (Tex. App.—Corpus Christi–Edinburg June 24, 2021, no pet.) (mem. op.) (finding Judge Bell made several improper comments but affirming because the record did "not reveal that the trial court developed any antagonism or bias against [appellant] based on prior proceedings in an unrelated case").

54

prosecutor on how to present the State's case. *See id.* Instead, the record reflects that Judge Bell mistakenly believed that his communication with the State was merely administrative in nature. A claim based solely on a judge's rulings, remarks, or actions will "only in the rarest circumstances evidence the degree of favoritism or antagonism required" to show judicial bias or partiality. *Gaal*, 332 S.W.3d at 454 (quoting *Liteky*, 510 U.S. at 555). For the reasons stated, Devon has failed to make this showing. *See id.*

### 3.    Admonishment

Finally, Devon claims that Judge Bell gave Christopher "incorrect advice" about whether the State could seek to reindict him for capital murder if he continued to refuse to testify. When Christopher was initially called back to the stand on the second day of trial, Judge Bell admonished him that reindictment was a "possibility," though he also stated that he did not know whether the State "can or can't" reindict. Christopher's agreement stated in part that he agreed to "[b]e de-briefed by law enforcement, and to be completely honest & forthcoming to all questions asked." The State clearly believed that this obligation extended to testifying truthfully at Devon's trial,[5] and there is at least some case law suggesting that Judge Bell's admonishment to Christopher about the potential consequences of his refusal to testify was legally plausible.

---

[5] We note that the terms of Christopher's plea agreement are memorialized on a one-page, pre-printed form that requires the parties to select from a laundry list of possible terms. This form does not include any express provision requiring a defendant to testify truthfully at a co-defendant's trial. It appears that the State treats the selection made in Christopher's plea agreement as a catch-all cooperation agreement. In federal court, a "Plea and Cooperation Agreement" details exactly what is expected from the defendant in terms of cooperation, including "to respond truthfully and completely to all questions, whether in interviews, in correspondence, telephone conversation, before a grand jury, or at any trial or other court proceeding." *See, e.g.*, *Plea and Cooperation Agreement*, Antitrust Division U.S. Dep't of Just., https://www.justice.gov/atr/case-document/plea-and-cooperation-agreement-0 (last visited on Dec. 05, 2023).

In *Brunelle v. State*, the appellant was indicted for capital murder but, pursuant to a plea agreement, he pleaded guilty to the lesser-included offense of murder and agreed to testify at his co-defendant's trial. 113 S.W.3d 788, 789 (Tex. App.—Tyler 2003, no pet.). Nearly three years later, after the appellant had been convicted and sentenced, he refused to testify at his co-defendant's trial, and the State filed a motion to withdraw the plea agreement, which the trial court granted. *Id.* Although the court of appeals ultimately determined that the trial court had lost its plenary power to grant the motion and that the State would instead need to seek relief in the court of criminal appeals, the court stated the appellant's prior conviction was not an impediment to the State's motion. *Id.* at 790. ("Even though the defendant has been convicted, if the State cannot receive the benefit of its bargain, the plea can be withdrawn and the parties returned 'to their bargaining positions which led to the initial plea agreement.'" (quoting *Ex parte Sims*, 868 S.W.2d 803, 805 (Tex. Crim. App. 1993))). In discussing the contractual nature of plea agreements, the court of criminal appeals later cited this proposition from *Brunelle* with approval. *State v. Moore*, 240 S.W.3d 248, 250 (Tex. Crim. App. 2007).

Regardless of whether the State could successfully reindict Christopher for capital murder based on his perceived failure to comply with his plea agreement, we cannot conclude that Judge Bell's admonishment to Christopher about this possible outcome is indicative of some concerted effort to assist the State in Devon's prosecution. *Cf. Sandoval v. State*, 665 S.W.3d 496, 514 (Tex. Crim. App. 2022), *petition for cert. filed*, (U.S. Sept. 20, 2023) (No. 23-5618) (holding that judicial bias "cannot be shown when the trial judge's manifest intent is to benefit the defendant and protect his rights"). Even if the

admonishment was incorrect, Devon's argument, at bottom, requires us to make an inferential leap that Judge Bell's actions were motivated by bias, and we simply cannot make that leap on the record before us. *See id.* ("[A] judge's actions during trial can show bias only if they reveal 'such a high degree of favoritism or antagonism as to make fair judgment impossible.'" (quoting *Gaal*, 332 S.W.3d at 454)).

## D.    Hostility Towards Devon's Trial Counsel

As additional support for his judicial bias claim, Devon argues that Judge Bell was openly hostile towards his trial counsel on three occasions.[6] First, when Devon's counsel objected that Judge Bell's ex parte communication with the State was "highly inappropriate," Judge Bell interjected with, "Highly, not just inappropriate? Well, I just need to know what you mean by highly." Next, Judge Bell subsequently accused Devon's trial counsel of initiating his own ex parte communication with the trial court:

| | |
|---|---|
| THE COURT: | Oh, I'm sorry. Mr. Wilson, I do need to put on the record, you asked me for additional time, more than 20 minutes? |
| [COUNSEL]: | Yes, sir. |
| THE COURT: | When you asked that, none of the State's attorneys were present. |
| [COUNSEL]: | Mr. Lassmann was here. |
| THE COURT: | No, he was not. Mr. Lassmann, were you here when he asked for additional time above 20 minutes? |
| [COUNSEL]: | He was sitting right there. |

---

[6] As a fourth example, Devon also alleges that Judge Bell "interrupted counsel's questions of [a] recalcitrant witness and directed [counsel] how to conduct his examination of the witness." However, the record citation provided by Devon does not exist. *See* TEX. R. APP. P. 38.1(i) (requiring arguments to be supported with "appropriate citations . . . to the record").

[PROSECUTOR]:      I was here when he first asked it.

THE COURT:      When he was up here at the bench and said he would need more than 20 minutes, I looked over there, and there was nobody in any of those chairs.

[COUNSEL]:      I turned and looked at him.

THE COURT:      All right. You can put that on the record.

[COUNSEL]:      Go ahead, Your Honor.

THE COURT:      No, go ahead. It had to be important to interrupt me. Go ahead.

[COUNSEL]:      Judge, it's human.

THE COURT:      It's human to interrupt the Judge, okay?

[COUNSEL]:      Judge, it's a mistake. It happens.

THE COURT:      Say what you need to say, Mr. Wilson.

[COUNSEL]:      For the record, when I asked the Court for additional time, I was standing in front of the bench. I turned to my right because I knew Mr. Poynter had walked out. I saw Mr. Lassmann sitting in the seat that he's sitting in right there. I did that because I wanted to make sure I didn't have the same problem that I had complained about earlier.

THE COURT:      For the record, when Mr. Wilson asked for the additional 20 minutes, there was nobody seated at any of the chairs, and none of the State's prosecuting attorneys were present. So we both have it on the record.

[COUNSEL]:      Thank you, Judge.

Ideally, judges would always exercise restraint, no matter the perceived provocation. But Judge Bell's apparent annoyance with Devon's trial counsel falls within

58

the realm of imperfect judicial conduct that does not rise to the level of bias. *See Liteky*, 510 U.S. at 555; *Gaal*, 332 S.W.3d at 455.

Finally, Devon complains that "[a]t the close of [counsel's] opening statement, the trial court erroneously instructed the jury to disregard statements that clearly reflected [what counsel] expected the evidence to show." Before opening statements began, Judge Bell reminded the parties that "opening statements are to tell the jury what they expect the evidence will show, not to argue the case." The State concluded its opening by saying, "That's what the evidence is going to show. Thank you for your time." Devon's counsel, on the other hand, concluded his opening by saying "we believe the evidence will say that he is not guilty, and we believe that that's the verdict that you should render." Judge Bell took exception to counsel's suggestion of what the jury "should" do:

> Ladies and Gentlemen of the Jury, I'm going to instruct you not to consider anything he said at the end about what you should do or should not do. As I tried to explain to both attorneys, [an opening statement] is only designed to tell you what the evidence will show, not to suggest what you ought to do with that evidence. So I'm instructing you to disregard that portion of it, the closing—or opening statement.

Judge Bell's pre-statement warning and instruction to the jury were consistent with the law and well within his discretion. *See Guillory v. State*, 397 S.W.3d 864, 868 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (noting that "the character and extent of [an opening] statement are subject to the control of the trial court") (citing *Dugan v. State*, 199 S.W. 616, 617 (Tex. Crim. App. 1917) ("[W]hen an accused in a timely manner seeks to avail himself of the privilege of making an opening statement, and does not seek to abuse the privilege by commenting upon improper or inadmissible facts, *converting it into argument*,

or otherwise misusing it, it should be accorded . . . ." (emphasis added))). Accordingly, this complained-of conduct does not support Devon's claim of judicial bias or partiality.

**E.      The Admission of the Facebook Photo**

Devon also argues that Judge Bell "advised the State at the bench how to get a photo into evidence that he had disallowed in light of the defense objection. The State took his unsolicited advice and was able to admit the photo [into] evidence." Other than citing the reporter's record, this is the extent of Devon's argument regarding Judge Bell's alleged misconduct concerning the admission of the Facebook photo.

The State sought to introduce a photo posted to Facebook through the testimony of Deputy Starry, who said she received a screenshot of the post from Christopher's wife. The photo was posted to the Facebook account of "Devon Debord" and allegedly depicted Devon on the morning of the murder wearing a hooded sweatshirt and a mask. Devon objected that the photo was "hearsay." Judge Bell initially sustained the objection, explaining that there was no evidence in the record "that suggests [Devon] put [the photo] on [Facebook]." Judge Bell then granted the State's request to take Deputy Starry on voir dire to "prove up the picture."

Outside the presence of the jury, Deputy Starry identified the clothes worn by the person in the photograph as the same clothes Devon was wearing on the day he was arrested. She noted that Devon has a distinctive tattoo on his face, below his right eye, but the person in the photo was covering that portion of his face with the ski mask. She further testified that the Facebook post included the caption "MOB for Life," and Devon later used the same phrase in a letter he wrote to his mother while being detained in

county jail. This comparative letter was admitted into evidence without objection for the limited purpose of authenticating the post. Based on this testimony, the State argued that it could "authenticate th[e] picture."

Devon's counsel then questioned Deputy Starry, who again acknowledged that she did not receive the post from Devon. Deputy Starry further testified that she could not confirm that Devon made the post other than the fact it "has his name at the top." Based on these facts, Devon reiterated his hearsay objection and also raised a relevance objection.

After a lengthy explanation of his thought process and additional argument by Devon's counsel, Judge Bell announced that he was going to admit the photo because the photo did not contain hearsay, and he was satisfied that the State could show that the person in the photo was Devon. When the jury was called back in, Judge Bell asked Devon's counsel to restate his objection for the record. Counsel responded that he was objecting based on authentication because the State had not shown that the person in the photo was Devon. Judge Bell overruled the objection, and the screenshot of the Facebook post was admitted into evidence.

According to Devon, by briefly explaining his initial decision to sustain Devon's hearsay objection, Judge Bell effectively provided the State with a roadmap for how to get the photo admitted. We do not agree with Devon's dim view of Judge Bell's conduct surrounding the admission of the Facebook post. Explaining "why" an objection is being sustained is not tantamount to telling the other side "how" to overcome the objection. Moreover, we will not fault a judge for merely explaining his ruling; we suspect that

61

attorneys generally appreciate the opportunity to understand a judge's reasoning and respond accordingly. Here, Judge Bell provided both parties with ample opportunity to develop the record and put their best arguments forward before making his final ruling, and as such, we cannot say that he displayed bias against Devon or partiality for the State.[7]

## F.     Communications with Tucker's Family

As his final example of biased conduct, Devon points to uncontroverted evidence that Judge Bell communicated twice with Tucker's family while the trial was ongoing. One occurred at a restaurant near the courthouse where members of Devon's family observed Judge Bell approach and speak with members of Tucker's family for approximately five minutes before sitting down at his own table to eat lunch during a break. The other involved a brief interaction between Judge Bell and the Tucker family outside the courthouse while the jury was deliberating Devon's punishment. During this interaction, which was recorded on a cell phone, Judge Bell is seen walking towards the courthouse entrance where the family had gathered. He waves to the family and stops to talk with them for approximately thirty-five seconds. As he leaves, one gentleman offers Judge Bell his hand, and Judge Bell shakes it before walking back inside the courthouse. According to Devon, these interactions "raise the appearance of partiality," and the mere appearance of partiality is sufficient to establish his claim. We disagree.

First, it appears that Devon is relying on the standard for recusal articulated under

---

[7] In fact, Judge Bell's thorough process allowed Devon's counsel to eventually land on the objection that he now advances on appeal—authentication.

Texas Rule of Civil Procedure 18b. *See* TEX. R. CIV. P. 18b(b)(1) (requiring recusal in any proceeding in which "the judge's impartiality might reasonably be questioned"). This standard looks at the judge's conduct through the eyes of a reasonable, disinterested person and asks "whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge and the case, would have a reasonable doubt that the judge is actually impartial." *Ex parte Ellis*, 275 S.W.3d 109, 116 (Tex. App.—Austin 2008, no pet.) (quoting *Kniatt v. State*, 239 S.W.3d 910, 915 (Tex. App.—Waco 2007, order) (per curiam)). But Devon has not appealed the denial of his motion to recuse Judge Bell, which would have been reviewed under an abuse of discretion standard. *See* TEX. R. CIV. P. 18a(j)(1)(A); *In re E.R.C.*, 496 S.W.3d 270, 279 (Tex. App.—Texarkana 2016, pet. denied) (explaining that, under this standard, appellate courts "view the evidence [from a recusal hearing] in a light most favorable to the court's decision and indulge every legal presumption in favor of its judgment"). Instead, he is relying on evidence developed in that parallel proceeding to support his overall claim of judicial bias under the Due Process and Due Course of Law Clauses. While there is certainly some overlap between a constitutional claim of judicial bias and a motion to recuse under Rule 18b, unlike the reasonable person test, we are not concerned with whether the record raises "reasonable doubt" about Judge Bell's partiality. Rather, under Devon's constitutional claim, we are tasked with reviewing the record to determine if it clearly demonstrates actual judicial bias that denied Devon due process. *Compare Ex parte Ellis*, 275 S.W.3d at 116 (motion to recuse), *with Tovar*, 619 S.W.3d at 792 (constitutional claim), *and Brumit*, 206 S.W.3d at 645 (same).

Returning to the record, Devon acknowledges that there is no evidence about what was said during these momentary exchanges. Because Judge Bell is entitled to a presumption of neutrality and impartiality, and there is no clear showing otherwise, we assume that his actions were merely misguided attempts at being cordial.[8] *See Tovar*, 619 S.W.3d at 792; *Earley*, 855 S.W.3d at 262; *Brumit*, 206 S.W.3d at 645; *cf. Duffy v. State*, 428 S.W.3d 319, 326–27 (Tex. App.—Texarkana 2014, no pet.) (finding recusal warranted where trial judge initially indicated that he would accept a plea agreement but later rejected it after the victim's family met with the judge and expressed their opposition to the agreement). In short, we conclude that Judge Bell's actions were not "so extreme as to display clear inability to render fair judgment."[9] *Liteky*, 510 U.S. at 552.

## G.  Conclusion

Although we do not condone some of Judge Bell's conduct, looking at each of these complaints, both individually and collectively, we hold that Devon has failed to clear the high hurdle necessary to show judicial bias or partiality. Devon's second issue is overruled.

---

[8] As a reminder, all judges are required to "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." TEX. CODE JUD. CONDUCT, Canon 2(A), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B.

[9] We have also reviewed two other allegations that Devon made in his motion to recuse: (1) that Judge Bell engaged in another communication with the Tucker family inside the courthouse; and (2) that Judge Bell commented on the weight of the evidence by making a gesture and audibly gasping during Devon's testimony. The State disputed these allegations and provided controverting evidence. Based on the testimony and other evidence presented at the hearing, including video clips taken from a security camera inside the courtroom, we conclude that Devon failed to prove that these incidents occurred. The first allegation was based on conjecture, and the second allegation is simply not supported by the video evidence.

## IV.    ADMISSION OF THE FACEBOOK IMAGE

By his third issue, Devon argues that the trial court abused its discretion by admitting the Facebook image because the State failed to properly authenticate it.[10]

### A.    Standard of Review & Applicable Law

"The admissibility of evidence is within the discretion of the trial court and will not be overturned absent an abuse of discretion." *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). If the trial court's ruling was within the zone of reasonable disagreement, an appellate court should affirm. *Id*.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a). Authenticity may be established with evidence of the item's "distinctive characteristics," including its "appearance, contents, [and] substance." *Id.* R. 901(b)(4). "Conclusive proof of authenticity before allowing admission of disputed evidence is not required." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). Instead, the trial court acts as a gatekeeper by determining whether the proponent of the evidence has made a prima facie showing of authentication under Rule 901. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). In other words, the trial court decides "whether the proponent of the evidence has supplied facts

---

[10] In passing, Devon also suggests that the Facebook image "was irrelevant and hearsay." Because these arguments were not adequately briefed, we will not address them. *See* TEX. R. APP. P. 38.1(i); *Williams v. State*, 937 S.W.2d 749, 487 (Tex. Crim. App. 1996) (concluding that the issue of whether a photograph's probative value was substantially outweighed by the danger of unfair prejudice was inadequately briefed when the appellant failed to explain why he believed the photographs were unfairly prejudicial).

that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic." *Id.* Once this threshold requirement is met, the jury ultimately decides whether the evidence is authentic. *Id.*

Electronic evidence, such as information on social networking websites, can be authenticated in a variety of ways, depending on the circumstances of the case. *Id.* at 639–41. For example, the substance of the electronic communication may "indicate circumstantially that [the purported sender] was in fact the author of the particular communication." *Id.* at 641.

## B.    Analysis

Devon contends on appeal that the State failed to make a prima facie showing that he was the person in the image or that he authored the Facebook post. We disagree on both counts.

Deputy Starry, the State's sponsoring witness, testified that the individual in the image was wearing the same clothing that Devon was wearing at the time of his arrest—blue jeans, a black hooded sweatshirt with a zipper, and a brown belt with a distinctive white stitch pattern along the top and bottom of the belt and "DEBORD" engraved on the back in large capital letters. A photograph of the belt had been previously admitted into evidence. This evidence was sufficient for the jury to determine that the individual depicted in the image was Devon. *See* TEX. R. EVID. 901(a), (b)(4).

To show that Devon authored the post, the State offered a handwritten letter by Devon to his mother that he signed "MOB FOR LIFE." This letter was admitted without objection as a statement by a party opponent. *See* TEX. R. EVID. 801(e)(2)(A); *Trevino v.*

66

*State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999) ("Rule 801(e)(2)(A) plainly and unequivocally states that a criminal defendant's own statements, when being offered against him, are not hearsay."). This unique expression is identical to the caption in the Facebook post and was sufficient circumstantial evidence for a rational jury to find that Devon controlled the Facebook account and made the post in question. *See Tienda*, 358 S.W.3d at 641.

Because the State made a prima facie showing that the evidence was what the State purported it to be—an image of Devon that he posted to his Facebook account—we conclude the trial court did not abuse its discretion by admitting the Facebook post. Devon's third issue is overruled.

## V.    UNDISCLOSED WITNESS

With his fourth issue, Devon argues that the trial court erred by allowing the State to present the testimony of Deputy Jaramillo because, contrary to a pretrial order, the State failed to disclose Deputy Jaramillo as a potential witness.

### A.    Standard of Review & Applicable Law

Like the admission of other types of evidence, a trial court's decision to allow the testimony of an undisclosed witness is reviewed for an abuse of discretion. *Nobles v. State*, 843 S.W.2d 503, 514 (Tex. Crim. App. 1992). To succeed on such a claim, the defendant must show that the State acted in bad faith by failing to disclose the witness and the defendant could not otherwise reasonably anticipate that the witness would be called to testify. *Id.* at 514–15 (citing *Hightower v. State*, 629 S.W.2d 920, 925 (Tex. Crim. App. [Panel Op.] 1981)). Generally, an appellate court will affirm the trial court's ruling if

67

it is correct under any theory of law applicable to the case. *See State v. Esparza*, 413 S.W.3d 81, 88–89 (Tex. Crim. App. 2013).

## B.   Background

Approximately four months before trial began, the trial court granted Devon's "Motion to List Witnesses" and ordered the State to "provide written notice to defense counsel 14 days before the first trial setting of the name, address, and telephone number of each person who might be called to testify at any stage of the trial." This obligation extended to any potential witness the State discovered after the deadline. In such a scenario, the State was ordered to "notify defense counsel on the next working day."

The State did not file a formal list of potential witnesses. However, on May 3, 2021, three weeks before trial commenced, the State filed an application with the District Clerk of Goliad County requesting the issuance of subpoenas for eleven witnesses, each identified by name, address, and phone number. Deputy Jaramillo was not listed in the application. After Christopher testified on the second day of trial, the State called Deputy Jaramillo. Devon objected that Deputy Jaramillo "wasn't listed," and the trial court overruled the objection before the State could respond.

## C.   Analysis

Devon contends on appeal that the State had a duty to disclose Deputy Jaramillo as a witness under the trial court's pretrial order, the State's failure to do so was done in bad faith, and Devon could not have reasonably anticipated that the State would call Deputy Jaramillo. The State responds that Deputy Jaramillo was called as a rebuttal witness after Christopher effectively became a defense witness, and the State is generally

68

exempt from pretrial disclosures of rebuttal witnesses.

As detailed above, Christopher's reason for invoking his Fifth Amendment privilege changed between the first and second days of trial. Originally, Christopher explained that he was refusing to testify because he is not "a snitch." When Christopher eventually agreed to testify on the second day of trial and effectively became a witness for the defense, Devon's counsel began by asking Christopher whether they had met prior to Devon's trial. Christopher agreed that they had not. Devon's counsel then elicited testimony from Christopher that he was reluctant to testify because the State had previously threatened to prosecute him for perjury if he did not testify consistent with his prior statements inculpating Devon as an accomplice in the burglaries. After Christopher completed his testimony in which he recanted his previous statements and took sole blame for the burglaries, the State called Deputy Jaramillo, the jail administrator for the Refugio County Jail where Christopher was detained between the first and second days of trial.

It is undisputed that Deputy Jaramillo was called as a rebuttal witness. In particular, the State elicited testimony from Deputy Jaramillo that Devon's counsel met with Christopher at the county jail the previous evening, between the first and second days of trial. Devon argues that the sole purpose of this testimony was "to imply that Christopher was lying, while also insinuating [that Devon's counsel] improperly influenced Christopher's testimony." Devon contends that this line of questioning shows the State was acting in bad faith because it used Deputy Jaramillo's testimony to strike at Devon

over defense counsel's shoulder.[11] *See Davis v. State*, 268 S.W.3d 683, 713 (Tex. App.—Fort Worth 2008, pet. ref'd) (explaining "that the 'over-the-shoulder' rule is designed to protect the defendant from improper prosecutorial character attacks directed at defense counsel").

However, whether the State acted in bad faith is irrelevant because the State had no obligation to disclose Deputy Jaramillo as a potential witness in the first place. The Texas Court of Criminal Appeals has previously held that the State's duty to disclose potential witnesses under a pretrial order does not extend to rebuttal witnesses because the State cannot be expected to "anticipate any possible defense of an accused." *Hoagland v. State*, 494 S.W.2d 186, 189 (Tex. Crim. App. 1973). Such a requirement would place "an impractical and undue burden" on the State, according to the high court. *Id.* As Devon concedes in his brief, "[a]lthough Christopher was subpoenaed as a potential witness, [neither] the State, nor [Devon], could have predicted Christopher's testimony." Accordingly, the trial court did not abuse its discretion by permitting the State to call Deputy Jaramillo as a rebuttal witness after Christopher gave admittedly unpredictable testimony for the defense. *See id.* Devon's fourth issue is overruled.

## VI. HEARING ON MOTION FOR NEW TRIAL

By his final issue, Devon complains that the trial court erred by allowing his motion

---

[11] We note that Devon did not raise an over-the-shoulder objection in the trial court; instead, he only objected to the State's ability to call Deputy Jaramillo as a witness because the State failed to disclose him as a potential witness. Generally, "[a] complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial. *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009). We assume without deciding that Devon may use this unpreserved complaint to show bad faith.

for new trial to be overruled by operation of law without granting him a hearing on his motion. He argues that his motion raised matters outside the trial record and asks that we remand the case to the trial court to conduct a hearing on his motion.

## A.      Standard of Review & Applicable Law

We review a trial court's denial of a hearing on a motion for new trial for an abuse of discretion. *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009). Conducting a hearing on a motion for new trial serves two purposes: (1) the trial court decides whether the case should be retried; and (2) it allows the appellant to prepare a record for presenting issues on appeal in the event the motion is denied. *Id.* A defendant does not have an absolute right to a hearing on a motion for new trial. *Id.* "A hearing is *not* required when the matters raised in the motion for new trial are subject to being determined from the record." *Id.* (cleaned up) (quoting *Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim. App. 1993)). When the matters raised in the motion are not subject to determination from the record, a hearing is only required if the defendant "establishes the existence of 'reasonable grounds' showing that the defendant 'could be entitled to relief'" and supplies an affidavit specifically setting out the factual basis for the claim. *Id.* When these requirements are satisfied, the trial court abuses its discretion by failing to conduct a hearing because that denial prevents meaningful appellate review. *Id.*

## B.      Analysis

Even assuming the trial court's decision not to conduct a hearing on his motion for new trial was error, we agree with the State that Devon was not harmed by the decision. Before Devon's motion for new trial was overruled by operation of law, Devon was granted

71

an evidentiary hearing on his contemporaneous motion to recuse or disqualify Judge Bell. Importantly, that motion was based on the same allegations of judicial bias that Devon raised in his motion for new trial. Some of those allegations concerned matters that could be determined from the trial record, while others concerned conduct by Judge Bell that allegedly occurred outside the trial record; namely, Judge Bell's communications with Tucker's family during the trial. During the recusal hearing, Devon presented five witnesses and six exhibits to support his allegations of judicial misconduct that occurred beyond the trial record. The record from that hearing was included in the appellate record, and Devon has relied on it to support his claim of judicial bias on appeal.

Devon has not suggested that the record on appeal would contain any additional evidence if he had also been granted a hearing on his motion for new trial. To the contrary, the record indicates that Judge Harle provided Devon with a full and fair opportunity to put his best case forward during the recusal hearing. Thus, because we are satisfied that Devon has received meaningful appellate review on his entire judicial bias claim, we conclude that the trial court's decision not to conduct a hearing was harmless. *See id.*; TEX. R. APP. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *cf. Cook v. State*, 240 S.W.3d 906, 911–12 (Tex. Crim. App. 2007) (deciding that appellant's "deprivation of counsel during 30-day critical stage for filing a motion for new trial was harmless beyond a reasonable doubt").

Nevertheless, Devon argues that his recusal hearing cannot serve as a substitute for a hearing on his motion for a new trial because the two motions involved different

72

standards and Judge Harle only decided the merits of his recusal motion. If we understand his argument correctly, Devon contends that he was denied the benefit of having the trial court consider this additional evidence before it allowed his motion for new trial to be overruled by operation of law. However, at Devon's request, we have now reviewed the entire record, including that additional evidence, and as set forth above, we have determined that it does not support his claim of judicial bias. Devon's final issue is overruled.

## VII. CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
14th day of December, 2023.